10013

McMILLIAN *ET AL.* v. KOLLOCK *ET AL.*

(96 S. E. 372.)

1. Deeds—Capacity of Grantor—Sufficiency of Evidence.—In action to set aside deed for incapacity of the grantor, evidence *held* insufficient to sustain finding grantor was without sufficient capacity

2. Deeds — Undue Influence — Sufficiency of Evidence.—Evidence *held* insufficient to show that the execution of a deed was procured by undue influence.

Before Memminger, J., Marlboro, Fall term, 1917. Reversed.

The action was to set aside a deed for the grantor's incapacity, and the testimony was as follows:

James Welsh, sworn on behalf of the plaintiff and examined by Mr. T. I. Rogers:

"I knew Nancy Cottingham. She was my wife's sister. She had one child who died I think in 1910, before Nancy died. This child did not leave any children. Nancy left one brother, Ezekiel Thomas, and three sisters, Sarah, Laura and Eliza. It is the common repute that they died without children. Rachel had no children; Sarah had some children. She was my wife. My wife left two children, Fannie, who married Lee McMillian and Rosanna, who married Gray Peterkin. Nathaniel Murdock was Nancy's brother. She was a Murdock before her marriage. Ezekiel Thomas, the other brother, was born after freedom. Nathaniel Murdock left one child I think, and there might have been two. Lula McIntosh was one, and I don't remember the name of the other. She has not been heard of for 7 or 8 years. I don't know whether she is living or not. Nancy didn't have a sister named Maggie. Nathaniel left four or five children, but all are dead except Lula, so far as I know. One of Murdock's children was named Maggie. She married William Cook. One William Taft Cook. I don't know the names of the others. Aunt Nancy was 86 years old, I think, when she died, and she was living at the time of her death in Hebron with James McRae's widow, Gracie McRae. She went there in April and died in November. She stayed with her daughter, Mag, till the latter died in April, 1910. It might have been in 1909 that Nancy died. I think it was the same year the deed was executed that she died. The year she and Maggie both died was the year she gave the deed. She inherited the land from her daughter, and her daughter got it from her aunt, Rachel Welsh. There was no relation whatever between Nancy Cottingham and Gracie that I knew of. I attended the funeral of Nancy's daughter, Mag. Aunt Nancy was there. My wife and I went to Mag's house to the funeral. McRae's family had a carriage and took the old lady to the funeral. After the funeral

they took her home with them and also Ezekiel Thomas. I went home and told McRae I would be back tomorrow and see to Mag's things. When I went back they were cleaning and straightening up, and John Duncan McRae, old lady Gracie's son, was there. I let them have the rations that were there to take to his mother's. They straightened up the things, and I went back home. Eliza McRae and another one of the girls did the straightening up. Gracie lived about 2 miles from Aunt Nancy. I live 4 or 5 miles away. Maggie McLean left a will, and Tom Greene and myself were executors. We went over there to see about the old lady. Greene asked some questions. Greene said we ought to see Gracie and see how much she was going to charge for waiting on Nancy. We called to her, and asked her what she charged, and she didn't say whether she would charge anything or not. She just didn't say anything. Gracie was 60 or 70 years old. My wife and her brothers and sisters and Nancy Cottingham were all on cordial family terms. Before the death of Mag there was no intimacy between Gracie McRae and Aunt Nancy, except visiting each other. Gracie went over there; sometimes I met her there. Nancy didn't know Mag was dead. She didn't have mind enough to know. She had been so she could do nothing for 4 years. I talked with her frequently. She just talked about whatever you talked about, and she asked you no questions. She was more like a child and had no more judgment than a 3-year-old child. The last time I saw her before her death was the first Monday in November. She had been sick a day or two. I saw her three or four times from the death of Mag up to her own death. Went to see her three or four times. She would be sitting by the fire or lying in bed. She was like old folks, didn't have anything to say, just quiet and peaceable. She didn't show any interest in current events; made no inquiries about any of the family and no inquiries of any character. I don't think I was there in June. I stated Mag died in April. The

records show this deed was executed the 25th of June. I do not think I was there in May. I was not there in July. I do not think I went there after Mag died until she got sick. I went only once after she got sick. I went to see her twice at Gracie's and it might have been three times. John Duncan McRae, Gracie's son, took charge of the land after Mag's death. He worked it that year. It was planted after she died."

The following question was asked: "Was the old lady sick, other than being decrepit from old age, until within the last few days before she died?" Answer: "When I went she seemed to be as usual."

Cross-examination by J. K. Owens:

"Nathaniel Murdock was a brother of Nancy Cottingham. Three or 4 years before the death of Nancy she lived with Mag McLean, her daughter. The McMillian people lived about 7 miles below Clio. The Cooks lived on Mr. Kemper Covington's place, about 2 miles. They were all young, lived with their father. Their mother was dead, I reckon. After the death of Nancy's daughter she went to live with Gracie McRae. During the 3 or 4 years before Nancy's death, while she was with Mag, I was there two or three times a year. Before Mag got sick Nancy was most helpless part of the time. After she went to Gracie's I remember two visits I made, but it seems that I went three times. The first time I went she was not doing anything, sitting by the fire, and the last time I went she was in bed. Dr. Kinney tended her. I am about 66 or 68 years old. Gracie and I were about the same age. Gracie had a right good home. They stayed on a plantation known as the Fraser place. She had a nice home. The old lady was comfortable, and I could see nothing wrong as to the care taken of her. She was peaceable, quiet and satisfied. I heard no complaint. I do not know that I saw her do anything that was peculiar or out of the ordinary or that looked strange but act childish. She would not have anything to say unless

you approached her, then she acted politely and answered right.  She was not in a spirit to talk, I don't suppose.  I don't think she was in bad health all the time.  It required a good deal of time and attention to make her comfortable.  She did not notice anything about the house while I was there.  I stayed three or four hours.  I would go in the morning and leave after dinner.  It was after 12 the last time when I got there, and I stayed there about three hours.  Nancy was in the south room at Gracie's.  I asked her how she was; she said she was poorly.  I asked her if she wanted some oranges, and I gave her some.  She knew me all right.  I don't think that she spoke to any one else while I was there.  Gracie went into the room, but she didn't say anything to her.  When she went home with Gracie two or three of Gracie's daughters and Nancy's brother, Ezekiel Thomas, went with her.  Ezekiel is in Marion.  My first wife, Nancy's sister, was dead at that time.  I have married since that again.  I do not try to get her to go home with me, and I don't know that any one else tried to get her to go home with them.  The McRaes carried her there in the carriage.  After Mag's death no one was there, and she couldn't stay there alone."

Redirect by Mr. Rogers:

"Nothing was said to her by any one.  Gracie had her in the carriage and carried her home.  Ezekiel Thomas was living in Marion then, and just went to Gracie's for dinner.  It has been nearly 2 years ago since I saw him at Marion.  He lives on a place he bought east from Marion 3 miles."

Thomas Greene, sworn on behalf of the plaintiffs, examined by Mr. Rogers:

"I am about 71 years old, and I own a plantation close to the Maggie McLean land, I suppose about 2 to 2½ miles from it.  I knew Nancy Cottingham for a long time.  I knew the Welsh family, and I never saw a more agreeable family.  They thought a great deal of each other.  I do not

know the names of the Cook children.  There were two or three children."

It is admitted that there are three of the Cook children, Nerissa, William Taft and Maggie Lennox Cook, the children of Maggie Cook, who was the daughter of Nathaniel Murdock.

"Nathaniel Murdock was a brother of Nancy Cottingham. I knew both of them since my childhood, the whole family. I don't know how old Aunt Nancy was.  I was a boy in 1857, 14 or 15 years old, and she was a grown woman, a young lady.  This land was known as the Welsh property, the estate of George and Rachel Welsh, Rachel being George's wife.  This particular tract of land of 23 acres, after Rachel's death, went to Mag McLean.  I was one of the executors of Rachel Welsh's will.  Mag McLean was a daughter of Nancy Cottingham.  I saw Nancy often during her last several years of her life; attended the same church. I was one of the preachers, and I saw her about once a month for the last 3 or 4 years of her life, and in cases oftener than that.  I looked upon her as an invalid and childlike.  She came to church more or less, and about the last 2 or 3 years they would have to take her in and out of the church.  Her capacity to understand and attend to affairs was limited. Her remembrance and judgment was.  I talked with her frequently, but on no special business.  When I first knew her she had very fair understanding, but along towards the last 2 or 3 years her memory was short, and she could not dictate for herself.  During her last estate I went to the Judge—I took an active part in looking after her.  I was at the funeral of Maggie McLean.  The old lady was there, but I don't remember having anything to say to her.  I went to the house, but they were in the act of leaving.  I did not pay any attention to the company she was in.  The McRaes made arrangement for her to go to the church.  From the church she went home with Mrs. McRae.  I do not know in whose carriage, but she was conveyed to the church by them

and carried home by them. It might have been a month after Mag's death before Jim Welsh and I, as executors, had the appraisement of the estate. All the provisions that were there was allowed to be carried to Mrs. McRae. Jim and I went to see Mrs. McRae. The first time I went to see what the old woman needed. I talked with Gracie on these different trips. The first time I went I had Gracie come down here and purchase some clothes, etc., that were needed. About a month after Mag's death this was. The next time I went to see something about the money that Mag willed to Nancy. I talked to Gracie about it. Asked the old lady some questions. I said to her, 'I suppose you got your money?' She says, 'They say so.' Then I asked Gracie had she got it, and she said, 'Yes.' I asked her what she did with it, and Gracie said she put it in the bank in her own name. I told her that Nancy had no money then if she put it in her name, and she would have to change it. She said nothing to this. I think Jim was with me when I went to see about the money. At that time we had been on the question of what Gracie charged to keep the old lady, and when I went to get the cloth for her Gracie asked me what we were going to allow her for keeping Nancy. I told her what she thought was right, and for her to talk with the children, and we would pay her what they agreed upon. I tried to make arrangements with her that day about it. She didn't give me any satisfaction; would not make any charge at all, nor give me any satisfaction about it. On a previous occasion she asked how much we were going to allow her. I asked Nancy before I spoke to Grace, and she replied to me, 'They say so,' and I saw there was no use in talking any more to her because of her condition. They would have to tell her who I was every time I went there, and she has known me ever since I was a child. She never recognized me at all, and the McRae family were careful to let her know it was 'me.' I never went far enough with her to tell her anything which she did not agree to, as I did not

consider her competent.   I went there at least once a month, and perhaps oftener, while Nancy was there.   She was in the condition which I have described all the time she was at McRae's and before that.   The first time I paid attention to her mind and weakness was when I was visiting Mag before her death.   I knew her mind was limited before, but I paid close attention to it then.   She was not competent to tend to business from what I saw of her on these visits.   She could not understand the nature of business.   I didn't know anything about the deed being executed until after Nancy's death.   I think her death occurred in 1910. ˙ Mag died about April, and I think the old lady died in October of the same year.   I suppose I learned about the deed being executed some time between her death and the first of November.   The place was rented out, and there came up some objection, I suppose.   The objections were to the man moving to the place.   The executors rented it, and not until we rented it did I know about the deed.   I suppose it was about three weeks after I came down here to get some clothes and had Gracie to meet me here.   That time I went there and tried to make arrangements about how much board was to be charged.   Gracie asked me what I was going to allow her for keeping the old lady.   It was about a month after that before I went to Gracie's again to try to get her to come to terms as to what she was going to charge and to inquire about the money.   I might have gone between these times, but don't think it was more than a month.   It was about seven weeks after she first went to Gracie's.   The money that I was inquiring about was insurance on Mag's life.   I don't know how much it was.   The McRae family have been in possession since then of the land, Gracie's and those claiming after her.   I know the land well; it is very valuable.   It is in the midst of the best farming section in the county.   A part of this same tract of land sold a few years ago for $120 an acre.   There are 8 or 10 acres in the wood.   I do not know how much is in cultivation.   I would say that it would

bring $100 an acre if put on the market. It might bring
more or less. There are two buildings on it; one is a barn,
the other a dwelling, not very good. The dwelling is a right
roomy house, about four rooms, barn and stables. I don't
know that there are any shelters."

Cross-examination by Mr. Owens:

"I don't know the connection between Jim McRae and
Nancy Cottingham. I think Mag McLean's father's name
was Alfred Murdock. I don't know who Jim's mother was.
I never did know his people. I do not know that Jim
McRae's mother and Mag's father were brother and sister.
I think Nancy Cottingham's first husband's name was
Alfred. I cannot truthfully say whether it was Alfred Mur-
dock or Thomas. Jim McRae was the head of the McRae
family. He was a smart man. Jim McRae looked after
Mag's and Nancy's business. He had a general oversight
over their business. The relations between Mag and Nancy
and Jim were close and friendly. Nancy and Mag both
thought a great deal of Gracie. I do not know what Nancy
said when she went to Gracie's. I was an executor, and
Nancy was to get the property."

In reply to the question, "Didn't Nancy go to Gracie's for
the reason that she wanted to go and they had the best place
for her," the answer was, "No; the place that was designated
for her to go was with a girl Maggie raised, but this girl
was sick at that time; her name was Mag Calhoun; she lives
3 or 4 miles from her." "Mag and Nancy lived there
together on that place 8 or 10 years perhaps." "I don't
know of any man who helped them tend to business except
Jim McRae."

In reply to the question, "Aunt Nancy looked to Jim to
attend to her business," the witness answered, "She did not
have sense enough to know anything about it." In reply to
the question, "She did not know anybody else that she
wanted to stay with, did she," witness answered, "She was
designated to go to Little Mag's. I did not hear her say

that she did not want to go; there was no one left at home for her to stay with after Mag died. I am not able to say which was the most comfortable home, the one she had been living in or the Gracie McRae home. Both homes were very good. I have not been at Mag McLean's home lately, about a year or so before Mag died. The home was in good condition then. Nancy was buried at Spears' Church. I think her husband was buried there. I do not know that Nancy said she wanted to be buried there. I never heard her say anything about that. It was a week, or perhaps less than a week, that I was at Gracie's before Nancy died. I do not know what I said. There was not much to say. During the last several years of Nancy's life she grew older, and her judgment was very limited. When she wanted water she went staggering across the house. She went to bed at 2 o'clock and she would not get up until 10 or 12 the next day. I was there when she went to bed."

To the question, "You were there the next morning when she got up at 10 o'clock," the witness answered: "No; I happened to be the next day when she got up perhaps. I went there frequently, perhaps every other day, perhaps every day. That is, when she was at Mag's. I do not know of anything out of the ordinary while she was at Gracie's. George Lauch McNeill is a neighbor. I am a preacher at one church, and he is an officer of another. Joe Spears is a neighbor in that neighborhood. He attended Spears' church. Alex McCall is another neighbor, and attended Spears' church. I do not know which church Nancy belonged to. Mag was member of our church, and would bring Nancy to preaching with her. Jim McRae died before Nancy Cottingham. Jim and Gracie McRae were intelligent people, so far as I know. They were my friends. They were considered as good colored people as there were in the community. Gracie was what I call a middle-age woman. Mag died towards the last of April. I don't remember exactly what time in October Nancy died.

It might have been a month or more than a month after Mag died that I went to see about the money. When I went to see Nancy at Gracie's she looked like she was satisfied, so far as I thought. They always had to and would tell her who I was. They would say, 'Uncle Tom Greene has come to see you.' They might have called me 'Brother Greene.' I took it for granted after that that she knew me. I did not ask her any other questions. I think I told her I was going to get clothes for her, and she made no reply. I settled up Mag McLean's estate and got my discharge. It might have been that the Rev. Jackson was Aunt Nancy's preacher. He preached at Spears' church. I do not know what church she was a member of. I was a preacher at Hopewell, and do not know whether she was a member there or not. I am impressed that she was a member of Spears' church. I do not know anything of Jim McRae's father and mother nor of Alfred Thomas. Mag took care of the old lady, and the two women lived alone, and Jim McRae attended to their business, and it has been that way ever since she lost her husband."

Hanford David, sworn in behalf of the plaintiff and examined by Mr. Rogers:

"I am 68 years old and lived for a long time just over the mill creek between here and Tatum, and moved to Bennettsville about 2 years ago. I lived at that place about 50 years. I lived near Nancy Cottingham since I was a little boy. I knew her brothers and sisters about as I knew her. They all stayed on the same plantation, and I knew them well and intimately. They looked like they thought a great deal of each other, and lived in a brotherly and sisterly way. I cannot tell exactly how old Nancy Cottingham was when she died. She was between 70 and 80. I am 68 years old. When I went out there I was a small boy, and she was grown and married. I did not see her very often; I would see her in passing. I saw her about a month before her daughter died. She was lying under the edge of the house. She

did not know me.   She was just lying there; I don't know how she came to be there.   Her daughter had to make her know who I was.   I was at the daughter's funeral.   She did not know me that day.   I did not speak to her.   She could not recognize me.   She never failed to recognize me before the last 2 or 3 years of her life.   The day of her daughter's funeral she looked like a child.   She did not regard her daughter's being dead at all.   As she was going up the steps some one spoke to her, and she broke out in a laugh.   From my observation at that time, she did not have any comprehension of business affairs.   I think her mind was gone.   I did not see anything of her after Gracie took her to her house.   I do not know anything about her after she went there.   I am well acquainted with that tract of land.   I do not know what it is worth, but about $200, I reckon.   That land is more level than mine, and I got $2,700 for 8 acres.   I had a pretty good house.   Half of the land was in the creek.   The house and land cost $450. The Daniel Easterling place brought $90 per acre.   Mr. Caulk bought my land.   I reckon he could tend to his own business.   He was a grown man.   I think his judgment was pretty good.   I don't know of any piece that brought $200 an acre, unless it was Mr. Fayette Rivers' place.   He paid $3,000 or $4,000 for about 37 acres.   I don't know of any piece that brought $350.

The following question was asked: "Who tended to Nancy's business for her for several years before she died?" Answer: "You mean Miss—that old lady we were just speaking of."

Wilson David, sworn, says:

"I am going on 71 years old.   I lived with Nancy Cottingham and her family 3 or 4 years after the war, and have known them since.   Mag was her daughter, and she stayed with her.   They were friendly, and Aunt Nancy's sister and brothers were her friends so far as I know.   I have never seen anything wrong.   I saw a right smart of old

13—110.

Aunt Nancy during the last years of her life.  She appeared to know me.  I have seen people go in when I would be there, and she would not make them out exactly.  She did not have much mind.  Seemed like she set about and slept. Always seemed to be sleepy.  Sometimes she took notice of things, and sometimes you had to ask her about them.  I saw her once after Mag's death.  She appeared to be ailing. I didn't think she had a good mind.  I talked with her a heap.  She has been in that condition 3 or 4 years, I reckon. She used to be smart as any woman, and seemed to be a good Christian.  In her old age she got drowsy and sleepy.  I would have to talk to her; she did not talk much.  I paid good attention to her.  After she got in the condition I have described, in my opinion she did not have mind enough to know anything about property or what she did when she made a deed.  She was not much more than a child, just like children are.

"Question by the Court: She worked in the field and tended to household affairs sometimes?  Answer: She did not buy or make any trades.  Her daughter tended to everything.  She looked feeble.  I don't think she knew about what property was."

Cross-examination by Mr. Owens:

"I was at the burial of her daughter.  Nancy did not do anything out of the ordinary.  I saw her as she went in and out of the church.  She did not do anything out of the ordinary.  I did not hear her laugh.  I expect she was sorry of the death of her daughter.  She told me she had no Mag to call now.  She did not say anything else.  She did not say anything about wanting Mag to outlive her.  Jim McRae generally tended to their business, and he had been tending to outside affairs for them."

When asked the question, "Did you know why she went to Gracie's," the witness answered: "She had to go somewhere."  "I didn't hear her say anything about where she wanted to go.  She and Gracie had been special good

friends.   Jim McRae's mother had been dead a long time.
Her name was Eliza McRae.   Mag McLean's father was
Albert Thomas.   I do not know what kin Albert Thomas
and Eliza McRae were.   I do not think they were brothers
and sisters.   Thomas' father was named Weston.   I did
not know Eliza McRae's father.   Albert Thomas was
Nancy Cottingham's first husband and Mag's father.   I
went to Gracie's after Nancy went there.   She was very
poorly.   I think she knew me.   She did not talk about any-
thing.   I did not ask her any questions.   I think they treated
her all right.   Gracie and Jim's family were considered a
good family.   The last time I saw Nancy work she was
picking some cotton for Mag.   I never noticed any change
except that she grew older and more feeble."

Mary Gales, sworn.   Direct examination by Mr. Rogers:

"I do not know exactly how old I am, between 65 and 70.
I live on Mr. Hugh McLaurin's place.   I did not live any-
where about Nancy Cottingham during her life.   When I
moved into this country I moved into the house with her
and stayed there for about two weeks.   After that I moved
to Bennettsville, and after that did not live with her any
more for 5 years.   Then I moved to Jim McRae's, and was
living there when she was carried there.   I was not about
her much, and thought they attended to her the best they
could in her condition.   I had been very well acquainted with
her, and would speak to her sometimes, and she would not
know me till I told her who I was.   That was about all I
know about her.   I saw her every day or two.   I do not
think she was able to do anything.   She could not help her-
self.   She did not know anything about business.   Of
course I would pay attention to her.   She looked like she
was kind of mindless.   After taking all these observations
I do not think that she knew anything about the actual value
of property at that time.   She might have, but didn't appear
like a person that would.   She never disputed anything you
said to her.   I do not know that she was easily influenced.

I think that was about all she knew. I did not know anything about her making a deed to the land nor of her coming at Bennettsville, nor of any one bringing her to Benettsville. I knew Jim McRae during his life, his father and his mother. I have forgotten what his mother's name was. His father's name was Hardy. I do not know that his mother's name was Eliza. I do not know what Mag McLean's father's name was. I never saw him that I know of. I do not know whether she ever came to Bennettsville or not. I lived at the Fraser place 1 year, Kemper Covington place 9 years, and when Nancy lived with Gracie I was on the place that year. I cannot tell one thing that Nancy ever said to me or I to her."

Redirect by Mr. Rogers:

"I lived at McColl, on Mr. McLaurin's place last year, the same place the year before, and the same place the year before that. I lived at Kemper Covington's before I went there. I lived 1 year at Jacob's place, 1 at Kemper Covington's place, and 2 at Hugh McLaurin's. I have made four crops there, and it was 5 years ago that I was at the Fraser place, and it was that year Aunt Nancy died."

Recross by Mr. Owens:

"I cannot tell how long it was between the deaths of Nancy and Mag. It was all the same year. I do not know what time of the year Nancy died, but Nancy, Mag and Jim McRae died the same year. Jim McRae died first, and then Mag died, and then Nancy died."

Sam Greene, sworn on behalf of the plaintiff. Direct examination by Mr. Rogers:

"I have been living for 3 years on Dr. May's and Mr. Freman's place. I was at McQuage place in 1909, about mile and a half from where Nancy and Mag lived. I have known Nancy for about 41 or 42 years, and Mag for about 25 years. I generally saw Nancy once or twice a week during the last several years of her life. The last 3 or 4 years it looked like she was forgetful like old people, and it grew

worse as the years advanced. She would try to hoe some cotton. She quit that about the last year of her life. During the last year or two I saw her cooking; she could do that up to the time Mag died. I do not know how long before Mag's death before she got so she could not cook. She did not know anything about business affairs after she got in that fix. She did not attend to business. In the last years of her life her daughter could not leave her by herself. I do not know why this was, unless her mind was not right.. I do not know of her being consulted about business affairs. I saw her once or twice a week for the last few years she lived until Mag died. I saw her once after that. From my observation of her she did not have sufficient comprehension of business affairs to transact business. She did not know the value of property. I do not know whether she knew she had any property or not. I never heard her say anything about it. Sometimes she would recognize me, and sometimes she would not. I only saw her once after Mag's death. It was in October, I reckon. I do not know when she died; some time in October. I was not at Mag's funeral. As I told you, up to the last year she would be working in the field. The last year I do not remember seeing her working in the field." This was the answer to the question: "What about her condition and capacity for attending to the ordinary affairs of life while you were seeing her once or twice a week? She did not transact any business. Jim McRae was there often. Part of the time she seemed to be conscious of what was going on, but during her last days she did not seem to be conscious of what was going on. I do not know the piece of land that Mag lived on well."

Cross-examination by Mr. Owens:

"Q. When did you ever see any business transacted in which Nancy Cottingham was interested? A. Well about 4 or 5 years before she died. She was hoeing cotton. I never saw her engaged in business, and I was never there when any business was discussed. I don't know whether she ran

an account or not; Mag did. And I don't know whether she stayed where she wanted to stay or not. I do not know of any dissatisfaction. I do not know why she would be there, unless she wanted to, and I do not know of any better place for her. I do not know of any other property that Nancy Cottingham had. I don't know of her ever attending to any business matter before. I don't know of any business she ever had. When she was living with Mag all she had to do was what she could about the house and Mag took care of her and provided for her. She worked in the house and field for Mag. I have never seen her try to do any business. I have talked with her very much."

To the question, "Did she show she was crazy," witness answered, "Sometimes she knew me and sometimes she would not."

To the question, "Tell me something foolish she ever said or did; can you remember anything?" witness answered: "Not rightly, as I know of. I can remember some things that she did that any old person like her would not have done. I almost forgot. I won't tell that. An hour or so at the time was the longest I ever talked to her, and I only saw her once after she went to Gracie's. She was sick then. I went there, and Gracie asked me if I wanted to see Nancy, and I said yes. I went in the room. Gracie asked her if she knew me, and she said no. I never said anything more, and she did not. She liked the McRaes. They called each other cousin. I do not know what the relationship was. They acted like cousins. I do not know of any of the family ever being unkind to her. I saw Nancy while Mag was sick. Jim McRae's daughter, Della, and another old lady—I forget her name—attended to things when Mag was sick. I never knew Nancy to meddle with anybody. She acted like she wanted to act, and behaved herself. I have seen her at church, and she behaved as nice as anybody. She looked like she was listening to the preacher, and I guess she went to

church as often as she could. I do not know whether she paid her debts or not. She picked and hoed cotton."

Redirect by Mr. Rogers:

"Your answer to these questions refers to the time she was doing these things? A. Yes. She could not do them the last year of her life."

Simon Hayes, sworn on behalf of the plaintiff. Direct examination by Mr. Rogers:

"I live on the Laurence Easterling place. This is my second year, and have lived in the immediate neighborhood for about 30 years. I lived at the Welsh place 4 years ago, the year after Mag died. Instead of the fourth year, it was the fifth year since I was at the McRae place. I rented the land from Mag McLean and Jim Welsh every year, and paid the rent to Mag and Jim Welsh, both of them. The year Mag died I tended the place to the end of the year. I paid the rent to James Welsh. I did not see Aunt Nancy daily. About once a month or once in two months, whenever I went there. Mag's place was about 5 miles from the Welsh land. The first year I went there I would visit Mag from time to time. She was an old friend of mine. I had been acquainted with them 28 years, and worked with them. She would be glad to see me, and I would go in and ask her if she knew me. I believe I would ask her if she knew my name, and she would say, 'I do not know.' Mag would tell her who I was. I would tease her, and go off and come in at another door and ask her if she knew me, and she would tell me the same thing. Sometimes I would tell her I was the same fellow that was sitting by her, and ask her if she remembered me, and she would say 'no.' That was 3 or 4 years before Mag died. It was the same way when I first went there. I teased her, and she was lively, but she was not near the woman in her last years that she was when I worked with her. She never did any work about the premises. Mag waited on her from start to finish. Q. Did that old woman have any comprehension of any business affairs that

was going on around her in the last year or so before she died? A. No; I would not think she did, according to her actions and ways. Whatever you said or asked her to do that was what she did. She never suggested anything herself."

Cross-examination by Mr. Owens:

"I went there sometimes once a month; sometimes not in two months. While she was living at McRae's I went there some. I suppose I might have gone four or five times during the last year at that place. I do not remember how many times I went the latter part of October. I do not think I made more than three or four visits that year, about twice before the middle of April. I saw old Nancy each time I went."

Redirect examination by Mr. Rogers:

"I think Mag died in April or May. I visited old Aunt Nancy during the last year that I lived on the Welsh place at Mag's. I did not visit her at McRae's."

Frances LeGette, sworn on behalf of the plaintiff. Direct examination by Mr. Rogers:

"I am 69 years old. Live on Mr. John Adams' place at Tatum, and have been there about a year and a half. I lived in Hebron about 36 years. In 1913 about one-half or three-fourths of a mile from Nancy and Mag; 1904-1906, half a mile; 1907, in calling distance; 1908 and 1909, one-fourth of a mile. I went there every day for 46 days and helped to nurse Mag and Nancy. Nancy was in bad condition; had no control of herself. She had no mind to know. She did not take care of herself in the way of cleanliness, and we had to tend to her like a baby. I left there about 12 o'clock Sunday night. Mag died between 6 and 7 o'clock Monday a. m. I got there a few minutes afterwards. We.went into the room where Nancy was, took her up and told her her daughter was dead. She said, 'Humph.' Said she had lived long enough anyhow. We carried her out and put her in a chair. She did not.pay any more attention until after

her daughter was buried. I went to the funeral. She did not pay any attention. McRaes carried her there. I did not see her when she left."

Cross-examination by Mr. Owens:

"I am not connected with the McRaes or with Nancy Cottingham in any way. During the last 3 years of Nancy's life she did not know me from anybody else. I stayed with her a good deal. She did not know other people. She did not know Mag. I saw Gracie there. I did not notice that she knew them. I saw her once at the funeral. I did not see her laugh at all. They helped her out of the carriage; took her into the church and to the graveyard; led her along. I was there when the preachers went. Rev. Jackson was her preacher. I have seen Alex McCall there. He was an officer of Mag's church. Never saw George Lauch McNeill. Saw Spears there and Joe O'Neal. They are officers of the church. I do not know what kind of a man Jim McRae was. He was smart; raised a large family and lived on a place near Mr. Hugh Covington. He didn't look after Nancy's business. He was dead before she died. He died about a month before Mag. Mag died last April. I do not know when Nancy died. She died the same year. I never went back to Mag's after she died. The house was closed. Me, Polly Johnson, Della and Eliza helped to nurse Mag. These were the ones to attend to her. We who were there looked after Nancy while Mag was sick. I never saw her any more after she went to Gracie's. I lived about three-fourths of a mile from Gracie. I knew Jim McRae's father. His name was Hardy McRae. I do not remember his mother's name nor her people. I do not know why Jim's people and Nancy's called each other cousin. I talked to Nancy about church business several times. She went very well to church until the last 3 years of her life; then she wasn't able. Her great trouble was that she could not control her bowels. She would carry three big sasks in the field and would put about a pound of cotton in each one, and claim

that they were full. Then they would have to bring her to the house. Mr. Sawyer was Mag's doctor. I do not know about Nancy. Nancy did not have anything except what Mag left her, that I know of."

Redirect examination by Mr. McColl:

"When they buried Mag Nancy told them to get Mag. She did not realize that Mag was dead, and she had just been to the burial."

John Malloy, sworn on behalf of the plaintiff. Direct examination by Mr. Rogers:

"I live at Tatum. During the past few years I have lived about 5½ miles from Mag McLean. I knew her well, and have known Nancy since before the war. I saw them at church and visited them about once a year. They were members of our church. Mag was, and we had to see after them. The last 3 years of her life Nancy had no mind at all. I noticed her frequently when they brought her to church. She lost all pride. She used tobacco and would spit on the floor. We always carried her to the front seat. On the day of the burial of Mag I helped her in the buggy and out. She asked me what my name was, and said: 'Oh, I know you. Go tell Mag to come on; let's go home.' I did not say anything more to her after that, and did not visit her at McRae's."

Cross-examination by Mr. Owens:

"I visited them about once a year. Nancy did not know me except when she was told who I was. I do not know about anybody else. She did not know me, and would ask me my name every time I would come and go."

"By the referee: She was not talkative. When I asked her something, she would answer me. I do not know of her making any trades within the last 3 years. I do not think, from what I have detailed she could understand a business transaction.

"By Mr. Owens: I never did know of her carrying on a business transaction, not in the last 2 or 3 years. She did

not have anything. I do not know that she had any business to attend to. Her daughter was a member of our church. These people who are trying to get this property are not members of my church. I do not know what the kinship was between Gracie McRae and Nancy. Kelley Cottingham was the only husband of Nancy that I knew anything about. I do not know who Mag's father was. I did not know him. Did not know Alfred Thomas or Alfred Murdock, and I did not know Eliza McRae, Jim's mother. I did not know either her father or her mother. I think Eliza's name was Thomas before she married. I do not know what kin she and Alfred Thomas were. I do not know who Emily Jane LeGette is."

Redirect by Mr. McColl:

"Eliza Thomas belonged to Mr. Phil Thomas' family, I think. That was Mrs. Lewis Hamer's father."

Recross by Mr. Owens:

"I do not know Ezekiel Thomas. I knew a man by the name of Ezekiel Murdock. He had three sisters, Nancy, Rachel and Sarah, to my memory. When Welsh said that there were three, and that their names were Sarah, Laura and Eliza; they were Murdocks. I do not know anything about Sarah, Laura and Eliza Thomas.

"By Mr. Rogers: Nancy's only husband that I knew was Kell Cottingham. She married him after the war. Mag was born in slavery, and belonged to Capt. Murdock, the father of Mrs. McIntyre. Two of his daughters married Mr. McIntyre. Thomas did not belong to Murdock. Mag was a Murdock before she married McLean. I was at the wedding. Jim and Nancy's people called each other cousins. That is the way our people do; call each other cousin, uncle and aunt."

Plaintiffs closed.

Mr. Milton McLaurin sworn on behalf of the defendant. Shown Book 10, p. 45, of Deeds and Conveyances, dated 25th of June, 1909, said:

"I drew that deed, and saw Nancy Cottingham the day she signed it. I do not remember the exact date, but it was several years ago. Some man came into my office—I do not know who—and I went out on the public square with him, where the old lady was sitting in a buggy. I asked her her name, and she said, 'Nancy Cottingham.' I said 'Auntie, here is a deed that I have prepared for you to sign,' and my recollection is that I read the deed over to her. I asked her if she knew what she was doing, and she said, 'Yes.' On account of her infirmity, I asked her some questions. I asked her if she was married. She said, 'No.' I asked her if she had been married, and she said, 'Yes, and my husband is dead.' I asked her if she would marry any more and she said, 'Why, sonny, you know I will not marry any more.' There was some one else present, and I, with the party, witnessed the deed. The reason I asked her these questions was, I saw she was old, and I wanted to see if she knew what she was doing. From the examination of her I thought at the time she was competent to make the deed. I had only a limited examination, but thought from my answers she was competent. She did not do anything or say anything, or use any expression, that made me question her capacity to make the deed. I had never seen her before, nor have I seen her since. I went out there for the accommodation of the old lady. I do not believe that I recall anything else that was said or done."

Cross-examination by Mr. Rogers:

"I do not remember the man. He was colored. I think there were two. I prepared the deed when they came into the office, and prepared it before I ever saw her. I went out with them to the buggy for the purpose of having her execute the deed. I have given all I remember of the conversation. She did not have anything to say; only answered

my questions.  I have given all the questions I asked her.
She merely answered these.  She did not get out of the
buggy.  She was very old.  I do not know who came into
the office, but whoever it was paid me.  I suppose at the time
I wrote it.  I cannot recall who they were.  This is all I
remember about it.  Her condition suggested the propriety
of asking her some questions, and I have detailed the exami-
nation so far as I know.  No; I cannot say whether she knew
what she was doing or not.  I asked her if she knew what
she was doing, but I cannot say whether she really did know
or not."

"By Mr. McColl: I was just running on foolishness."

Redirect by Mr. Owens:

"Her answers were sensible and responsive to my ques-
tions, and they satisfied me.

"Question by the Court: I cannot say who gave me the
terms and conditions of the deed.  The man came in, and
he gave them to me.  It is my recollection that he went with
me and witnessed the deed.  My recollection is that I read
it to her, and asked her if she knew what it was she was
doing.  I did not repeat to her what she was doing.  I told
her to whom she was making the deed.  I think I read most
of it, if not all of it.  The man told me the consideration
to put in the deed.  He told me the object was for love and
affection and attention to her.  Q. Having detailed facts as
far as you have, in your opinion was she mentally capable of
making a deed to her property?  A. Had I not thought so,
I would not have had her sign it.  I would not turn to either
side, as both are my friends.  Her condition was such as to
suggest that she might not be capable of making a deed.  I
did not go into full examination.  If I had, I might have
changed my mind.

"By Mr. Owens: One thing that lead me to think it neces-
sary to make inquiry was her age and general appearance,
and the fact that she could not get into the office.  I saw

that the body was weak, old and worn, and I wanted to satisfy myself.

"By Mr. McColl: Q. She gave you no reasons why she wanted to give away her property, and you relied on what this man told you? A. Yes; to some extent, I did. Q. You asked questions that 'Yes' and 'No' would reply to, and it required no thought on her part to answer? A. Yes. When I asked her, 'Auntie, you do not intend to get married any more?' I wanted to see what kind of answer she would make.

"By Mr. Owens: I gave the questions and answers the first time as nearly correct as I could recall them.

"By Mr. Rogers: I am clear that that was the extent of the examination that I gave her, and I asked nothing except what could be answered by 'Yes' or 'No.'

"By Mr. McColl: It was my opinion at the time that she did have sense enough to make a deed.

"By Mr. Owens: She used the expression 'You know, sonny, I won't get married no more.'

"By Mr. McColl: I was a white-headed man then, and a heap of old people call me 'sonny.'

"By the referee: My recollection is that I read the deed. I know I read part of it. Then I asked her if she understood what she was doing. She answered me, 'Yes.'

"By Mr. Rogers: I walked out there with the deed in my hand and read all of it, or a portion of it. After I had read it and asked her if she understood what she was doing she said, 'Yes,' and that was all that was said about the deed.

"By Mr. McColl: Yes; I was just being pleasant, as with every one else.

"By Mr. Owens: No; I was not trying to be sociable. . I asked to find out if she was competent to make the deed, as I have told you."

C. N. Edens, white, sworn on behalf of the defendant, says:

"I was living in Hebron in 1909. I knew Gracie McRae and Jim McRae and Nancy Cottingham. I saw Nancy during 1909 at Jim McRae's. I lived about 400 yards from Jim. I saw Nancy twice, and had a conversation with her the last time. I went to Jim McRae's to get molasses. In 1863 Nancy lived not far from where I was raised, and I had not seen her until she came to Jim McRae's. An evening or two after this I was passing there; saw her, and stopped to speak to her. We had a little conversation, but I cannot recall anything that was said or done that would cause me to think she did not have a sound mind. She seemed to have as good mind as I had. At that time Nancy's mind was as clear as any old person's generally is. I think she had a remarkable mind. While I was living there I never knew of anything or saw anything that led me to suspect she was not in her right mind. I knew Jim and Gracie McRae, and their home was certainly above the average in comforts and conveniences for colored people. Nancy lived at the George Welsh place I think before she moved there. That was about 6 miles from Tatum, between Tatum and Bennettsville.

"By Mr. Rogers: I talked with her twice. I said that I did not talk with her the evening that I got the molasses, but I did not talk much, just said a few words to her. I do not know anything that was said at that time. The next day or so she was sitting on steps when I passed. She did not say anything about the surroundings at the present time. We talked about the war time. I do not recollect anything special that was said. When we began to talk, I began to ask her about things, and she would remember them. That was about all we talked about; not about present day affairs, and nothing about her affairs; all about things that happened prior to the war. I do not recall the details of the conversation. I think she was a Cottingham during the war. I think she married a Cottingham during war times. She was a slave owned by Charles Cottingham.

"By the referee: I think she called me by my name.    I did not tell her who I was, and I do not know how she found it was me.    I had not seen her since 1863, and I do not know whether she knew me when she first saw me or not.    I do not know whether any one told her who I was; I did not.

"By Mr. McColl: No, sir; I did not do most of the talking. I always divide time.    Q. Do you think you divide time with everybody?    A. Sometimes I do, and sometimes I have to wait.    I think she had a remarkable mind for an old woman of her age."

Evander McColl, sworn on behalf of the defendant. Examined by Mr. Owens:

"I am about 75 years old.    I knew Jim and Gracie McRae and Nancy and Mag.    Jim McRae's mother was Eliza.    I do not know whether she was a Thomas or not, and I don't know who Mag's father was.    Nancy belonged to the Spears' church, and I belonged to the Spears' church, and am an officer there.    I visited Nancy.    I saw Nancy after she went to the McRaes.    She was comfortable there, good as could be.    They took mighty good care of her, just as nice as they could.    She made no complaint.    I did not talk much with her.    I asked her a few questions.    She told me that she got along very well.    I said to her, 'This is about as good place as you could get,' and she said, 'Yes.'    I told her I was glad to see her getting along so well.    She knew me then, and knew me the last time I saw her.    No one told her who I was; I went in the room, asked her how she was, and she said she was very weak.    I asked her if she knew me, and she told me who I was.    That was several weeks before she died."

Cross-examination by Mr. Rogers:

"I do not remember that I was there in June.    During the last few weeks before she died she had grown much worse.    I was at Mag's funeral.    I do not remember seeing Nancy.    I never heard anything at all about Nancy not

being in her right mind. I had no reason to think she was not. I thought she was like all old folks. She seemed to me to be capable of knowing what she wanted as any old person would be. She appeared to know the people around her. I never heard any of them talking to her much. Yes; it seemed to me she was capable of knowing what she wanted and making these wants known to the people. I do not recall any fact at the time about her behavior or conduct that is worth mentioning.

"By the referee: I do not know, I cannot say, whether she was capable of making a trade in reference to her property. She was in a condition in which she could be easily imposed on if any one wanted to. I do not know that in regard to her mind. Q. Was her mind, in your opinion, sufficiently strong to do as she pleased about her property, or could she have been easily influenced to do something else with it by people whom she liked? A. There was no one but herself, and it did not make much difference which way it went. Q. In her condition, old and childish, if any person she had confidence in, could they not easily have misled her? A. Yes; they might, in a sense. Q. She was not of that stern, strong fiber that would resist a person she liked? A. I believe that could have been done. I do not know whether they did it or not.

"By Mr. Owens: Jim McRae attended to Nancy and Mag's business a few years before they died. He was the one they looked to. Taking into consideration what the McRaes had done for these two women, and taking into consideration that she had to be taken care of there, I think it would have been a pretty good trade for her to turn over her property to them on condition that she would have a good home there always. I do not know of any of her people paying her any attention. I know the place. I think it was in 1909 that old Aunt Nancy was taken to Gracie McRae's. I do not remember the time of the year. I remember the time she died, but do not remember the exact date. Sup-

14—110.

posing that she was there six months, I think it would be worth $20 per month to look after her. I do not know whether $25 would be full pay or not. I think $30 would. Six months would be $180. About 27 acres of land in the tract. Makes good crops. Land in that locality is worth $100 to $200 an acre. There is a good deal of swamp in that tract. I don't remember how much swamp. When I told Mr. Owens that I thought it would be a fair trade, I qualified by saying that there was no one else for it to go to. The actual value of the service was about $180, but she did not know how long she was going to live. It seems that $30 a month would be reasonable.

"By Mr. Owens: No; when this trade was made they had not decided how long Nancy was going to live; they did not know anything about that. It was not made on a condition of six months. No one could tell how long or how much trouble Nancy would be to the McRae people at that time. I do not think any one would have been better to her than Jim McRae. The kindness and frienship had been existing for a number of years. There was 4 or 5 acres of swamp, I reckon, on the place. There was nobody there to attend to anything but Jim McRae. I never heard any talk of Jim Welsh and the McMillian children going there to help Nancy and Mag. I did not hear or see anything of any attention to her by them until after she was buried. So far as conduct was concerned, I did not know that she had any people, but I knew she had some. I cannot say that it would have been possible to have gotten anybody to have attended to Aunt Nancy if there was not friendship and love and friendly conditions. Just as a business transaction, I could not say that the comforts given her by McRae's family could have been secured for $30 a month. I do not know that anybody would have attended to her as the McRaes.

"By Mr. Rogers: By paying them you could hire them to do the work. That is, $30 a month would pay for taking

care of her, but you did not know the length of time she would live."

Randolph Breeden, sworn on behalf of the defendant. Examined by Mr. Owens:

"I am not kin to any of these people. I knew Nancy, Jim and Gracie. Nancy was a member of Spears' church, and I am a member of Spears'. I am an officer in the church; have visited Nancy and talked with her. She knew me. I did not visit her much after she went to Jim McRae's; I suppose two or three times. I was there more than that, but did not see her. She was taken care of all right. I had one conversation with her. She was not talkative. ·She answered me and talked intelligently and clearly, as old people will. She seemed to talk very sensible when I talked with her. For an old person her mind seemed to be clear. I visited her while she was at McRae's. All the changes that took place in Nancy during the last few years, that I noticed, was that she grew older. I did not notice any mental change. Jim McRae had been looking after her affairs for her before she went to Jim's. Nancy did not have much business, and Jim looked after Mag's. I do not remember being at the funeral of Mag. I know Mag McLean's place. There is just a common house on it, with a chimney at the end and a well. So far as the house is concerned, Jim McRae's was the best. There were more people there to attend to her. After Mag's death there was no one left there to look after Nancy. Q. Considering the care and · attention that Jim had given Mag and Nancy and the relations that existed between the two families and the further condition that during her lifetime, she was to be taken care of by Gracie McRae, state whether or not it was a good, fair, and reasonable arrangement for Nancy to make with the McRaes, to turn over this place to them on condition that they would take care of her. A. I do not know about that. I knew well enough it was worth something to take care of her. Q. That would depend. upon how long she was going

to live? A. I supose so. Q. At that time no one knew how long she would live? A. No. Q. Considering the time that she died, it was good pay for the McRaes to take the place? A. Yes. Q. But would they obligate to take care of her all her life for that place? Was it a reasonable arrangement for her to make? A. I suppose most any old person would have done so."

Cross-examination by Mr. Rogers:

"I do not know whether it would be a reasonable price to take care of an old lady like that. I do not know how much trouble she was. I do not know that $30 a month would pay to take care of an old person who had to be cared for like a baby, or to take care of a person like that. I do not know what it would be worth a month to take care of one who could not walk, or has to be waited on and washed; their clothing put on; changed and fed. I suppose you might hire a person to do it for from $30 to $50. I know the place. It is good land, worth $100 up an acre. It would bring not less than $100. I believe it might bring more. A person in her condition, you would expect that they would not live long. I could not say whether it would be a reasonable trade for Nancy or not.

"By Mr. Owens: Supposing that she had lived 10 years, or 7 years, it would have been a reasonable trade I think. I do not know what the doctor's bill would be. Old people are generally ailing."

Randolph Breeden, recalled:

"I know the tract of land referred to. For the cleared land, I suppose about $125. When I answered your question this morning, I meant that if Nancy had lived a good while it would have been a good trade on her part. As she lived a short time, it was a good trade for Gracie. Had Nancy been a long liver, it would have been a good trade for Nancy. If the place had been rented, it would not have paid expenses; would not have been enough to have paid any one to have attended to Nancy even for a year, had she lived that

long. I think Mag's husband died in 1900. I was living at Mr. Tom Covington's in 1897, I think, and I think that Mag's husband died the next year, when I was living with Jesse David. From then on Jim McRae attended to Mag's business. Nancy was a medium-size woman, stout, not very tall; would weigh about 150 to 160 pounds. Mag McLean was an agreeable woman. She limped when she walked. As it was, Nancy lived but a few months. It was a good trade for Gracie McRae, but if Nancy had lived a long time, it would have been a good trade for Nancy. I do not know how long she would have to have lived to have made it a good trade for her. I told Mr. Owens that the rent from the land would not have supported her during her life. The rent would have been about $125. I do not know how much it would have taken to support her during her life not for a year. It would take anywhere from $30 to $50 a month. That would be $480 a year. I think the land is worth $100, and I think the rent would have amounted to $125 a year the way land rents. By adding the value of the land to the rents for the time it was going on and divide by $480, you could tell how long it would support her."

Ardella Kollock, sworn, says:

"I am 39 years old. Jim and Gracie McRae were my father and mother. Nancy Cottingham was my father's aunt by marriage. She married my father's mother's brother. My father's mother's name was Eliza. Nancy's first husband was Alfred Thomas. My father, Nancy, and Mag told me that he died in slavery time. Mag McLean's husband died December 20, 1897. From that time up until the death of my father he attended to the business for Mag and Nancy. He did everythinfi that was necessary for a man to do in a business way. All business transactions for Mag and her mother were attended to by him. Her mother had no business. Whenever they got cotton out, he carried it to the gin, sold it, and brought the papers to her. My father helped and advised her along all lines and transactions in

making the crop.   If she had to go to the bank, he brought her.   The children of Jim and Gracie would go and work a day and two and three days at a time on Mag McLean's place.   Our father then would, when he could spare the time, go over and help Mag.   All of the girls, his sons and hired boys who were working with him, which would be about four or five horses and five or six girls, went with him.   Mag was crippled.   Nancy was a short, stout woman, good weight.   During the several years before she died she was physically weak.   She could not exercise herself as she had done.   It was impossible for her to control nature. She continued in that physical condition until she died. After she came to our home, and during the last few months of her life all of us attended to her; that is, my mother, Gracie, and the children.   I was there part of the time.   I was there when she died.   I was at Mag's when she died. Gracie was at home.   When Mag died Nancy was in her own room.   That was about 8:15 a. m.   Hattie McRae, now Davis, went in and told her.   Nancy came out of the room, and went to the bed where Mag was and said, 'Mag has gone;' and Hettie told her, 'Yes, Aunt Nancy; but you need not fret.'   She said, 'Yes; I have no Mag to call now; I would have thought I would have gone first.'   I went to the funeral.   Nancy was in Gracie's carriage.   She was carried into the church.   She seemed to know that Mag was dead.   We led her to the grave, and carried her to the carriage, and she said, 'Yes; I know the Lord giveth and the Lord taketh away, but the Lord knows best.'   We carried her and put her in the carriage, and she said she had no Mag to call now.   She went to our home that day.   We carried her and Ezekiel Thomas.   Ezekiel stopped at Wm. Cook's, and his brother-in-law brought him to our home that night, and he spent the night with us and went home next morning. Mag died the 21st day of April, 1909.   After Nancy came to our home only two of the family visited her:   Fanny McMillian did not stay long.   She lived a god distance.

Fanny never did say anything about Nancy going home to stay with her.   Q. What have you to say as to these parties that live at Tatum?   Do they know anything about these people?   Some of them seem to know a great deal about Nancy.   A. So far as their knowing her, they may have known her before I did, but none of them came to see her at our house but Tom Greene, and when he came I do not think it was for the business of seeing her.   Welsh was there twice to my recollection.   Nancy never was a talkative woman.   She never had much to say unless some one said something to her.   I do not recall any of the settlements between Mag and my father at which Nancy was present. When father went to settle any accounts and come back and give Mag the papers and told her concerning it, Nancy would sit down and listen to what he was saying and when he finished she would say something like, 'He came out pretty well this time, didn't he?' and Mag would reply, 'Yes, mother; Uncle Jim did pretty well.'   Dr. Kinney tended her after she went to our home.   She knew what she wanted, and she asked for it.   If she wanted water, she might ask one of the children to give it to her.   When she felt like it, she would go and get it for herself.   She talked like she had always talked since I had known her.   The only defect I saw was she had grown weak and did not have control of herself.   She had control of her mind, and knew how to think.   I never had any reason to think she was crazy, and never heard anything like that till she died. These people did not come and make any complaint about Nancy staying with Gracie.   Before we carried Mag to the cemetery, she wa asked by Jim Welsh's wife where she wanted to go, and she said she was going to Gracie's house. None of her people tried to keep her from going, and only one that I know of asked about her going, and said that it made no difference as to whether Mag had made a will, directing her to go to a certain place or not, but that Nancy must go where she would be satisfied.   That was Mag Cook.

The first week she came to Gracie's she would talk about Mag, and said Mag was gone. I would tell her, 'Cottingham, you need not worry about Mag.' She seemed satisfied and contended. As to her general health, she stayed just about the same, and during the summer was as spry as she had always been. She got bad off, and her last illness began the first or second week in October. Up until that time her health had been pretty good, and from that time she grew worse and worse until she died. She was buried in Spears' cemetery, where her husband was buried. The other members of the family did not seem to be interested as to where she was buried. I never heard any complaint."

Cross-examination by Mr. Rogers:

"I knew Nancy about 30 years. She had her mind when she died as good as she always had it, and, so far as I could see, she always had a good mind, and it lasted up to her death.

"By the referee: Q. Who suggested the arrangement whereby this deed was made to your mother? I suppose they had some talk about it before it was signed? A. I was not there when the deed was made, and did not see her sign it. I have heard them talk about it. No; not mother and Nancy. I do not know what arrangements were made for her staying at our house.

"By Mr. Owens: I was living in the flats near Red Hill when I learned about the deed. I had married. Nancy Cottingham told me about the deed. She told me that lot of hers, she gave it to Gracie and Gracie's children, and I said, 'You done that, Cottingham?' and she said, 'Yes; I think Gracie ought to have it because she has been better to me than anybody else, better even than Mag.' She got the land from her sister, Rachel Welsh. She gave it to Mag during her lifetime and then to Nancy. I married in May and left home.

"By Mr. Rogers: I had this conversation with Nancy near the middle of the last of July. I had been there once after

she made the deed, and the next time I went she told me
about it.   Nancy was the first one to tell me.   I asked my
mother about it.   She told me Nancy went to Bennettsville
and made the deed.   I knew I had been there once after she
made the deed before she told me.   That was in July.   I
married Cornelius Kollock.   I have had no talk with Dun-
can Kollock.   There was no plan, as I have heard, to have
the deed made before it was made.   Nancy was the first one
to tell me about it.   I heard no conversation between Tom
Greene, Jim Welsh and my mother about the charges for ·
keeping Nancy.   I heard no conversation between these men
and my mother while Nancy stayed there.   Greene came
one day and took mother out, but I heard none of the conver-
sation.   No one was present when Nancy told me.   She
said that little spot up yonder Sister Rachel gave her; she
gave it to Gracie; she thought Gracie ought to have it because
she had been good and kind to her and even done more than
Mag had done for her.   She did not say how she had given
it to her, and I did not ask.   I did not tell Mr. Owens that
she told me she had made a will.   She did not speak of it as
a will.   She said she gave it.   Did not tell me how.   It
was made in Bennettsville.   She did not say, and I did not
ask her who brought her, and I do not know now.   I do not
know whether Gracie was with her or not.   Gracie has been
dead near 5 years, not 5 years, but a good while.   I have
never asked who brought Nancy to Bennettsville that day,
and I have not heard any one say.

"By Mr. Owens : Neither I nor my sister received half of
the household and kitchen furniture from the executors of
Mag McLean.   The McMillians got a portion of them, and
Rose Peterkin's son, and some was left for Mag Cook, but
Mag Cook's husband never went for them.   I never heard
of my brother, Duncan McRae, getting any of the corn left
at the death of Mag.   I was married in May, and left home.
Some time in July I went home, and Nancy told me she had
given the place to my mother, and some time after that I

asked mother about it, and she told me when it was done."

Lilly Edens, sworn on behalf of the defendant. Examined by Mr. Owens:

"I am a daughter of Jim and Gracie McRae. Was at home while Nancy was sick there. I had conversation with her. I asked during her sickness if she was ready to die. She said she was. I asked here where she wanted to be buried. She said at Spears' graveyard, where her husband was buried. I asked her if she wanted to be buried at Hopewell, where Mag was buried, and she said she wanted to be buried with her husband. My father had a lot at Spears', and her husband was buried there, before I was born, I think. I married in 1910. I was at home all the time Nancy was there; waited on her; have heard her talk with people. When her old friends came in to see her, and no one that she had ever known seemed strange to her. She was not a great talker, and there was no change in her talking during the last few months of her life. She answered questions intelligently, and took an interest in the coming and going of people. I was at Mag's when Mag died. Hettie told Nancy that Mag was dead, and she came to the bed, cried and fretted, and said, 'Mag's gone, and I will have no Mag to call now.' I never had any reason to think she was crazy. I do not remember the first time I heard about her giving the land to mother. I remember the time she came to Bennettsville and the time the deed was made. My brother, Duncan John McRae, brought her. No one else came with them. Brought her in the buggy. I did not know what they were coming for. I don't remember the first time I heard them talking about it, but it was one day in the kitchen. I heard Nancy say she had given the place to my mother as a gift. I do not know anything about the agreement between my mother and Nancy. I remember when Tom Greene came. He came into the house, but I do not know where he talked to her. I did not hear that. When we would come back from preaching

Nancy would ask us about it, who preached, and sometimes what the text was. I never knew anything about the McMillians, the other parties who are after this land, trying to get Nancy to stay with them. They never came and nursed her, and when Nancy lived with Mag they did not go and stay there and nurse her, but I, my sisters and sisters-in-law nursed Mag. None of the McMillians were there. They did not go and help her. They would go to see her, not very long at a time. They took more interest in her after her death than they did before she died."

Cross-examination by Mr. Rogers:

"Nancy came to our house on the 13th day of April and never left, except to come to Bennettsville once. Brother Duncan John brought her. That is the only time she left the house. She never went anywhere else, and I do not know why she came that day. Nobody came with them. Duncan John helped her in the buggy that morning. Eliza helped take her to the buggy. She did not get anything up there that day, and it was some time after that before I knew why she came. Mother was at home. I never heard any talk between my mother and Nancy or Duncan John and Nancy or Duncan John and my mother about why they were coming that day, and did not know anything about it. Some time afterwards I found out. After my father's death Duncan John assisted my mother in the affairs around the house and all the business. Duncan John attended to the general affairs out doors and in the different towns. We traded mostly at Bennettsville, not very much at Clio after father died."

Eliza McRae, sworn on behalf of the defendant. Examined by Mr. Owens:

"Jim and Gracie McRae were my father and mother. Nancy married my father's mother's brother. Her first husband was Alfred Thomas, a brother of Eliza Thomas McRae. I was at home when Nancy came there. She acted all right. There was nothing peculiar about her actions.

She was not talkative. When asked questions, she answered intelligently. She did not seem to be wrong in her mind, and I had no reason to think her mind was unbalanced. I heard nothing of this kind until after she died. My father attended to Mag and Nancy's business from 1897 until my father's death. I and my other six sisters worked on Mag's place, being told to do so by my father. I was at home the day that Nancy came down to make that deed. I do not know when I heard about her making the deed. I was at home the day she came to Bennettsville, but I did not know what her business was. When she got in the buggy I went out of the house behind her. She could walk by herself after she got out of the door, and she seemed to be in her usual condition as to health and mind that day. She knew every one that she ever had known, and she took much interest in things about her. As long as she was able, she waited on herself, as far as she could. She went to the dining table, and she seemed to be satisfied all the time she was at home. She never made any complaint. My mother generally looked after her, and all of the girls who were at home would assist my mother." ·

Cross-examination by Mr. Rogers:

"I did not know why they were bringing her to Bennettsville. I heard no reason why they were coming. All I knew concerning it is that Duncan John took the buggy and brought her to town. I did not hear a word said as to why they were coming. The first I knew that they were coming was when they were preparing to come. Mother told me where they were coming. She did not tell me what for. She slept like anybody else, all night from the time she went to bed. She did not sleep in the daytime that I know of. I never did know her to fail to sleep at night. I knew she went to bed. I do not know when I first found out that the deed was made. I do not remember whether I knew anything about it before her death or not."

Redirect by Mr. Owens:

"Rev. Jackson has moved to Latta."

Joe O'Neal, sworn on behalf of the defendant. Examined by Mr. Owens:

"I am an officer in Spears' church, a steward. Nancy belonged to that church. George Spears and Evander McCall were officers in that church, also Randolph Breeden. I knew Nancy well, and saw her at church. She was there during the last 3 or 4 years of her life. I saw her at Mag's. Jim McRae attended to her business. I was at Jim's a day or two before he died. Jim McRae, just before he died, with Mr. Hamer, transacted some business in which Mag and Nancy were concerned. I did not see Nancy after she went to Gracie's. I cannot tell what the condition of her mind was. I saw her before she went there. Her daughter would bring her to church and bring her home. She behaved all right at church. I was not at Mag's funeral."

Pressley Davis, sworn on behalf of the defendant. Examined by Mr. Owens:

"I knew Nancy Cottingham before her death, about 25 years. Talked with her off and on all the time that I knew her, not very often. During the last few years of her life I lived about 2 or 3 miles from her, and saw her during her last illness at Jim McRae's. I did not talk with her. I went into the room where she was, soon after she went there, and just before she died. Jim McRae attended to her business and Mag's business."

Cross-examination by Mr. Rogers:

"I saw her twice after she went to Gracie's. I went on a visit to the McRae family. I do not know anything about her condition."

Hettie Davis, sworn on behalf of the defendant. Examined by Mr. Owens:

"Duncan John McRae was my first husband. He was a son of Jim and Gracie McRae. I knew Nancy and Mag. I was at Mag's house during her last illness, and saw Nancy.

She acted the same as any old person. She would go to her daughter's room, when she got up in the morning and ask how she was feeling. When you would ask her if she was ready for breakfast, she would say yes, and come to breakfast. She would get her stick and go out to the lot and look around. If there was any fodder, hay, or anything like that scattered, she would take it up and throw it into the lot, and if any one would take anything away with them, she would want to know what they had. I told her of Mag's death. She was in her room. It was about 7 or 8 o'clock. When I told her, she began to cry and fret, and Ardella and I began to talk to her and told her not to grieve, and she said it was all she had. She said: 'The Lord giveth and the Lord taketh away. Blessed be the name of the Lord.' I went to the funeral. Nancy went to the church and to the graveyard. She was taken in. She seemed to know that Mag was dead, and when they drove up and the hearse stopped she began to cry, and Gracie began to talk to her and told her not to grieve, Mag was better off. She got into the carriage and was carried to McRae's. She said she wanted to stay with Gracie. She said this to Harriet Welsh. I saw her at Gracie's from time to time after she went there. She would not be doing anything. I would ask her how she was, and she would tell me. And she would begin to tell me about Mag. She said she was getting along all right. I did not live at Gracie's. Nancy never complained to me in any way of mistreatment or lack of attention. The first time that I knew anything about the deed was after she was dead. I was not there when she died. I do not know exactly how long she remained in her same general health condition after she went to Gracie's and how long she was there before she began to be sick and grow worse. She seemed to know the people around her and who she cared for. She always told me that she thought most of Gracie. Said she seemed more like Mag to her.

I did not see any of the McMillians or the Welshes there while she was sick."

Cross-examination by Mr. Rogers:

"My husband died last Christmas; was a year ago. He did not live long after Gracie and Nancy's death. I do not know where the deed is. I never saw it. I do not know where Duncan John's papers are. Have never seen them since he has been dead. Never heard anything about the deed until after Nancy's death. My husband and I lived together until he died.

"By Mr. McColl: I have none of my husband's papers. I do not know where they are. I did not say that Nancy said something to Sarah Welsh about wanting to live with Gracie. I said Harriet Welsh, present wife of Jim Welsh."

In reply, Jim Welsh, recalled in behalf of the plaintiff. Examined by Mr. McColl:

"This piece of land originally came from my brother's estate, my brother, George. When he died it went to Rachel Welsh. She willed it to Mag McLean, and after the death of Mag it went to Nancy, but it was originally property of my brother. Tom Greene and I wound up the business of Rachel Welsh. We went to Gracie McRae's to make arrangements about Nancy staying there."

Cross-examination by Mr. Owens:

"We went there to see Gracie about paying Nancy's expense. We were going to pay it. Well, I suppose we were to get the money out of Mag's estate. After the death of Mag, the land went to Nancy. Mag had another place. We proposed to take the property that belonged to Mag and pay Nancy's expenses."

The will of Rachel Welsh and Mag McLean introduced by consent. Nancy Cottingham had fee simple title to the property involved; therefore the wills and other muniments

of title introduced in evidence are omitted. Testimony closed.

Jim Welsh recalled, examined by Mr. Rogers:

"Nancy did not have a bit of education; could not read or write. Yes, I stated that Tom Greene and I attended to Rachel's and Mag's business for them. I never did attend to any business for Nancy. She did not have any."

Redirect by Mr. Rogers:

"In administering Mag's estate we had to pay money to her. We put her there with Gracie, and we would go there and look after her. When Mag died I told them to take all the groceries, etc., that was left there over to Gracie's for Nancy, and all the money that came from Mag's estate, I put it where she could get it.

"By Mr. Owens: I do not know how much money there was. I signed checks for every one of the children to get their part. I gave the money and other property to those to whom the will said it was to go."

The following is the report of the referee:

The above entitled cause was commenced by service of summons and complaint dated June, 1910, the answer having been served on the 23d day of August, 1910. The plaintiffs, Fannie McMillian, Rosana Peterkin, Lula McIntosh, Nerissa Cook, William Taft Cook, and Maggie Lennox Cook, nieces and nephew of Nancy Cottingham, and Ezekiel Thomas, a brother of Nancy Cottingham, asked that a deed from Nancy Cottingham to Gracie McRae, dated June 25, 1909, be set aside for the reason that Nancy Cottingham, at the time, did not have capacity to understand what she was doing, and that she was old and infirm, so weak-minded and physically infirm as to be easily influenced by the grantee or any other person, and was unduly influenced by the said grantee to make the said deed, and for the further reason that the consideration mentioned in the deed was totally

inadequate, Nancy Cottingham being very old, and at the time of the making of the deed did not and could not have exercised a deliberate judgment, but that she was imposed upon, circumvented, and overcome by cunning artifice or undue influence. The answer is in effect a general denial. The cause was referred to me, with instructions to take testimony and to report conclusions of law and fact, with leave to report special matter, and after due notice the first reference was held the 12th day of January, 1914, and the reference concluded on the 26th day of January, 1914.

The deed was executed June 25, 1909, and recorded on June 28, 1909, in the office of the clerk of Court of the county of Marlboro, in Book 15, page 45. The consideration named is "love and affection and attention and care during my lifetime." All of the parties to the action are negroes, and I believe that all of the witnesses, except Milton McLaurin, Judge of probate for Marlboro county, and Mr. C. N. Edens, were also negroes. It seems from the testimony that Nancy Cottingham, for several years prior to 1909, and until April, 1909, lived on the tract of land in question with Maggie McLean, her daughter, and after the death of this daughter, the title of the property was in Nancy Cottingham. After the death and burial of this daughter, in April, 1909, Nancy Cottingham went to the home of Jim McRae, who was the husband of Grace McRae, and there lived until her death in October of that year. The parties to this action, and the nearest kin of Maggie McLean and Nancy Cottingham, seem to have lived greater or less distances from them, and paid little or no attention to them, and it also appears that for several years prior to the death of Maggie McLean, Jim McRae assisted her and her mother in their farming operations, and was the man that was generally looked to by them for assistance and aid. After the funeral of Maggie McLean, Nancy Cottingham was taken into the home of Jim McRae and his wife, and there well cared for during the remaining days of her life. Jim

15—110.

McRae died in the meantime, but Gracie McRae and her children continued to care for Nancy Cottingham. From the testimony, it also appears that this home was above the average among the negroes, and, in fact, there is no criticism or complaint of the treatment accorded to Nancy Cottingham, who at that time was old and infirm. One of the witnesses, James Welsh, who seems to be somewhat interested, gives her age at 86, while another witness for the plaintiffs, Hanford David, says that she was between 70 and 80 years of age.

The circumstances surrounding the execution of the deed were as follows: D. J. McRae, a son of Jim and Gracie McRae, came to town and went into the office of the Judge of probate for Marlboro county, and explained to the Judge, who was a lawyer, what he had come for, and the deed was drawn with care. The Judge of probate, with D. J. McRae, went out to the buggy where Nancy Cottingham was, and, seeing that she was an old negro, asked her some questions, and satisfied himself that she was capable of making the deed and knew what she was doing. He read the deed over to her, or part of it, asked if she understood it, and she told him that she did, and she signed it, and he and D. J. McRae witnessed the execution of it.

Here, then, was an old woman who had a piece of property which would probably bring something like an income of $125 a year, provided some one was able to attend to it. She and her daughter had for many years been on friendly terms and associated intimately with the McRae family. She had looked to Jim McRae for advice, counsel, and assistance, and, so far as the record shows, this was given free and without charge. The daughter dies, and the old woman goes to make her home with those who had done most for her, and who were very close to her. Here she found a good, comfortable home, where she was well cared for and attended to, and it seems to me that she naturally would desire that these people would receive at her death

whatever little property she might have, and she accordingly took the proper steps to carry out this purpose, and made the deed for love and affection, having at the time no doubt abundant reason to feel more strongly and kindly towards the McRaes than to any of her kin, at the same time providing for attention and care during the remaining days of her life, whether they be few or many. As it turned out, she lived only about six months, but this fact could have no bearing upon the *bona fides,* their intention, or their capacity.

From all the testimony, facts and circumstances, I am satisfied that Nancy Cottingham knew and fully understood the purpose, intent and effect of her deed, and I am also satisfied that Gracie McRae and Jim McRae and the members of their family exerted no undue or improper influence whatever.

I, therefore, hold that the deed of Nancy Cottingham to Gracie McRae is good, and that the allegations of the complaint of incapacity and undue influence are not sustained by the testimony, and I, therefore, recommend that the complaint be dismissed.

In so far as the legal questions are involved, there seems to be no difference of opinion as to the law in this case. In fact, counsel for plaintiffs and defendants cite practically the same cases, relying upon: *Pressley v. Kemp,* 16 S. C. 334, 42 Am. Rep. 635; *Banker v. Hendricks,* 24 S. C. 1; *Gaston v. Bennett,* 30 S. C. 467, 9 S. E. 515; *Willie v. Willie,* 57 S. C. 413, 35 S. E. 804; *Revels v. Revels,* 64 S. C. 257, 42 S. E. 111; *Zeigler v. Shuler,* 87 S. C. 1, 68 S. E. 817; *DuBose v. Kell,* 90 S. C. 196, 71 S. E. 371. In the last mentioned case will be found a review of the cases, and is ample authority to sustain the findings of this report.

*Mr. Jennings K. Owens,* for appellants, submits: *That in order to render the deed void upon the ground of the mental incapacity of the grantor, it must appear that there was on*

*her part such mental infirmity as to render her incapable of understanding the nature of the act:* 90 S. C. 208; 4 DeS. 521; 5 Strob. 190. *There is not a scintilla of evidence showing, or tending to show, that there was the slightest advantage taken of grantor, or to establish the fact there was any undue influence extended:* 90 S. C. 208; 64 S. C. 272, and the authorities therein cited; 3 Strob. L. 552; 7 Richardson's L. 80; 16 S. C. 344; 38 S. C. 215; 5 Strob. 190.

*Messrs. Townsend & Rogers,* for respondents, cite: *As to mental incapacity of grantor:* 57 S. C. 426; 87 S. C. 6. *As to confidential relations between grantor and grantee:* 61 S. C. 506-7; Pom. Eq., vol. XI, sec. 957; 57 S. C. 427.

July 2, 1918.

The opinion of the Court was delivered by Mr. Chief Justice Gary.

This is an action to set aside a deed on the ground of incapacity on the part of the grantor. The facts are stated in the report of the referee, whose findings of fact were in favor of the grantor's capacity to make the deed, and who recommended that the complaint be dismissed. His Honor, the Circuit Judge, did not discuss the testimony or make any specific findings of fact, but merely stated he was satisfied that the report of the referee should be reversed and so adjudged. The plaintiffs have appealed from said judgment.

The main question in the case is whether the preponderance of the testimony is against the finding of fact that the grantor was without sufficient capacity to make the deed. The conclusion reached by this Court is that the preponderance of the testimony is against the Circuit Judge's findings of fact.

We do not deem it necessary to discuss the facts in detail, as we are satisfied with the findings of the referee.

Reversed.

MESSRS. JUSTICES HYDRICK, WATTS and FRASER concur.

MR. JSUTICE GAGE, *dissenting.* I dissent from the opinion of the Court.

These are the cardinal circumstances of the transaction: The land in issue was worth $4,000. Nancy, the grantor, only got it by descent in April of the same year in which she conveyed it to Gracie, the grantee. Nancy conveyed it by deed to Gracie in June of that same year. Nancy died in October of the same year, and the grantee, Gracie, soon thereafter. The consideration was expressed to be love and affection and the care of grantor for her life. The grantor, Nancy, was upwards of 80 years old, very feeble in body by all accounts, and plainly of senile mentality. The grantee was not kin to her; the plaintiffs are her heirs at law.

The probate Judge who drew the deed testified:

"I do not remember the man. He was colored. I think there were two. I prepared the deed when they came into the office, and prepared it before I ever saw her. I went out with them to the buggy for the purpose of having her execute the deed. I have given all I remember of the conversation. She did not have anything to say; only answered my questions. I have given all the questions I asked her. She merely answered these. She did not get out of the buggy. She was very old. I do not know who came into the office, but whoever it was paid me, I suppose at the time I wrote it. I cannot recall who they were. This is all I remember about it. Her condition suggested the propriety of asking her some questions, and I have detailed the examination so far as I know. No; I cannot say whether she knew what she was doing or not. I asked her if she knew

what she was doing, but I cannot say whether she really did know or not."

It is true that the probate Judge testified he would not have had the grantor to sign the deed unless he thought her mentally capable of the act. He could not have answered otherwise. But in the same connection he said:

"Her condition was such as to suggest that she might not be capable of making a deed. I did not go into full examination. If I had, I might have changed my mind.

"By Mr. Owens: One thing that led me to think it necessary to make inquiry was her age and general appearance, and the fact that she could not get into the office. I saw that the body was weak, old and worn and wanted to satisfy myself."

The probate Judge drew the deed at the direction of a negro who was and is unknown to him. The deed was signed by the grantor while she sat in the buggy in front of the courthouse, in the presence of the negro. The identity of the negro who secured the deed to be drawn and signed was not surely fixed by the testimony. No witness was sworn who testified how the old woman came to make the deed. The man who procured it to be drawn and signed did not testify, and though he alone knew how the deed came to be made. That circumstance is pregnant with meaning; it is a badge of fraud. He is said in the brief to be the son of the grantor, and named Duncan McRae. The witnesses testified Duncan took Nancy to Bennettsville. The clear inference from these facts is hostile to the integrity of the deed. If a third person, the son of a grantee, may procure to be prepared to deed to his mother from an old illiterate and decrepit woman, dictate the contents of it, and see it executed, and when the deed is challenged give no account of it, then the property of old people is not safe.

In my judgment the decree of the Circuit Court ought to be affirmed.